# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISCTRICT OF ILLINOIS
### EASTERN DIVISION

THOMAS QUINN and THERESA QUINN,    }
                              Plaintiffs,  }
}

v.                                          }

SPECIALIZED LOAN SERVICING, LLC,  }
}
                            Defendant.  }

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction And Nature Of Action

1.    This is an action for damages and other relief brought by Thomas and Theresa Quinn against Specialized Loan Servicing, LLC for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (hereinafter "FDCPA"), which prohibits debt collectors from engaging in abusive, deceptive, and unfair practices. Additionally, Plaintiffs seek damages and other relief from Defendant for its practices in violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2.

### Jurisdiction And Venue

2.    The claims in this action arise under the laws of the United States and the state law claim forms part of the same case or controversy as it arises from the same factual basis as the causes of action under federal statutes.

3.    Jurisdiction of this court arises under 15 U.S.C. § 1692k(d), 28 U.S.C. § 1337(a), and 28 U.S.C. §1367. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

4.    Venue in this District is proper, pursuant to 28 U.S.C. §1391(b), in that the defendant transacts business here and the conduct complained of occurred within this District.

**Parties**

5. Thomas and Theresa are natural persons residing in Evergreen Park, Illinois.

6. Defendant, Specialized Loan Servicing, LLC ("SLS"), is a Delaware limited liability company engaged in the business of collecting debt in this state with its principal place of business located at 8742 Lucent Blvd., Suite 300 in Highlands Ranch, Colorado. SLS's principal business is the collection of debts and has registered in this state to do so. SLS also regularly attempts to collect debts alleged to be due another.

7. SLS advertises itself as a "special servicer", meaning it holds itself out as servicing loans that are non-performing (i.e., loans in default).

8. According to SLS, it services over 274,000 loans totaling over $29.6 billion in unpaid balances.

9. SLS does not own the debts it attempts to collect and regularly begins servicing the loan after they have actually or allegedly obtained the status of default.

10. Defendants are engaged in the collection of debts from consumers using the U.S. mails and telephone in the court of its business. Defendants regularly attempt to collect consumer debts alleged to be due to another. Defendants are "debt collectors" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

**Common Factual Allegations**

11. On November 25, 2008 the Quinns took out a FHA insured home loan with Cherry Creek Mortgage Co. in the amount of $169,759.00.

12. The Quinns loan was incurred for personal, family, or household services, i.e. to purchase their home, which they share with their three children, in Evergreen Park, Illinois.

13. After the Quinns purchased the home disaster struck. Tom lost his employment due to his employer closing its operations in January of 2009. A few months later the Quinn's middle son was diagnosed with epilepsy after suffering for three years with grand mal seizures.

14. The Quinns were informed by their pediatrician that their son would require constant care. In order to meet their son's medical needs Tom and Theresa decided that Tom should quit seeking employment to stay home leaving only Theresa to earn a living for the family.

15. The reduction in income caused the Quinns to begin to fall behind on the home mortgage loan obligations.

16. However, since the home loan was insured by FHA, the loan servicer was required to conduct loss mitigation efforts with the Quinns, including a face-to-face interview to discuss workout options with the Quinns. The primary purpose of these loss mitigation efforts would be to have a workout with the Quinns so that they would not lose their home.

17. Instead of making loss mitigation efforts, on July 18, 2012, Bank of America, then the purported owner and servicer of the loan, filed a foreclosure action against the Quinns in the Circuit Court of Cook County, Illinois. Of note, the complaint alleged that a default existed on the loan since at least May of 2009.

18. As an initial matter, the Quinns wished to address their hardship by retaining an attorney to negotiate their dispute with Bank of America. The Quinns retained the services of the lawyers at The Residential Litigation Group ("RLG") with offices located in Washington, D.C. for that purpose.

19. The Quinns paid RLG substantial sums to have RLG to assist them in negotiating with the loan servicer.

20. The Quinns signed an authorization form in favor of The Residential Litigation Group, which was forwarded to Bank of America.

21. However, the Quinns also needed assistance in actually defending the foreclosure action.

22. In order to defend the Bank of America foreclosure, the Quinns retained the services of Consumer Legal Group, P.C. ("CLG") to act as their attorneys.

23. The Quinns have paid and continue to pay substantial sums to CLG to defend the foreclosure action.

24. In the foreclosure action, CLG filed an answer and an appearance in the foreclosure action on behalf of Thomas and Theresa Quinn based upon Bank of America's failure to properly consider the loss mitigation requirements imposed by HUD.

25. The answer and appearance were both forwarded to Bank of America attorneys in the foreclosure.

26. On information and belief, Bank of America transferred the note to another party and there were a number of other subsequent transfers of the note until it was purportedly transferred to GMAT Legal Title Trust 2013-1.

27. Sometime between September and November of 2013 the servicing of the Quinn's loan was transferred from Bank of America to SLS.

28. Bank of America transferred certain records relating to the Quinns' loan, including the Authorization for the RLG firm and the foreclosure pleadings identifying CLG, as attorneys for the Quinns, to SLS.

29. SLS continued to retain the services of Pierce & Associates, P.C. to prosecute the foreclosure action.

30. In fact, employees of SLS responded to discovery requests propounded in the foreclosure action and indicated they could only be contacted through the attorneys at Pierce & Associates.

31. SLS began mailing correspondence, including monthly statements, to the Quinns beginning on September 10, 2013 demanding payment from the Quinns on the loan.

32. After acquiring the servicing rights to the loan, SLS began sending out inspectors to the Quinns' home. Although the loan agreement permits the lender to inspect the property, the permission is limited to circumstances when there is a good faith belief that such action is necessary to determine whether the home was vacant or abandoned.

33. The Quinns have continuously maintained their home and have not abandoned it since they began residing in it in December of 2008.

34. SLS had no good faith basis to believe the Quinns' home was either vacant or abandoned.

35. Nonetheless, SLS began a campaign of sending an "inspector" out to the Quinns home making their presence known by sitting outside the home and taking pictures.

36. The "inspections" have occurred almost every month since SLS began servicing the loan and since March of 2015 SLS escalated its campaign and began doing multiple inspections each month with some months as many as four inspections occurring in a calendar month.

37. Some of the Quinns' neighbors approached Tom and inquired about the constant presence of these inspectors taking pictures of the Quinns' home. The presence of the inspectors has caused the Quinns to feel humiliation as a result of the inspectors appearance to the neighbors.

38. In November of 2015 a "Independent Field Inspector" visited the Quinns home. However, the Quinns were not home at the time and the person left a door hanger marked "Confidential" on the front door of the Quinns' home.

39. Inside the door hanger the Quinns found a slip of paper. The slip of paper reads as follows:

| AT THE REQUEST OF SPECIALIZED LOAN SERVICE, AN INDEPENDENT FIELD INSPECTOR CALLED ON YOU TODAY. PLEASE CONTACT SPECIALIZED LOAN SERVICING AT 1-800-306-6062. THANK YOU | 2514 | TOM QUINN 9104 S CENTRAL PARK AVE EVERGREEN PARK, IL 60805 |
|---|---|---|

A true and correct copy of the slip is attached as Exhibit A to this pleading.

40.     On or about December 21, 2015 another "Independent Field Inspector" visited the Quinns home. Once again, the Quinns were not home at the time and the person left a  door hanger marked "Confidential" on the Quinns' property. A copy of the front of the door hanger is attached hereto as Exhibit B.

41.     Inside the door hanger the Quinns found a slip of paper, which reads as follows:

> At the request of Specialized Loan Service, an Independent field inspector called on you today. Please contact Specialized Loan Servicing at 1-800-306-6062. Thank you.

A true and correct copy of the slip is attached as Exhibit C to this pleading.

42.     The Quinns dialed the telephone number found on the slip of paper to find that the telephone number led to SLS' collections department and did not relate to inspections of the home.

43.     Most recently, on or about January 29, 2016 another "Independent Field Inspector" visited the Quinns home. Once again, Tom and Theresa were not home at the time.

44.     However, Tom and Theresa's 13 year old daughter was home alone and frightened by the banging on the door from the "Independent Field Inspector". The daughter still frightened called Tom and Theresa on the telephone while the person was still outside and banging on the door.

45.     The daughter reported to Tom and Theresa that the person was outside and banging on the door and stayed on the phone until the person left.

46.     The Quinns felt helpless to assist their daughter.

47.     Once Tom and Theresa were able to get back home they found another door hanger marked "Confidential" on the door.

48.     Inside the door hanger the Quinns found another slip of paper, which substantially appeared the same as the one left on December 21, 2015.

49.     On information and belief, the person who left the "Confidential" door hanger was the person who was banging on the door, frightening Tom and Theresa's daughter.

## Count I
## (Violation of §1692c(a)(2))

50.     Plaintiff repeats and realleges and incorporates by reference to the foregoing paragraphs.

51.     The FDCPA prohibits and limits communications from a debt collector with the consumer, in pertinent part the statute reads:

> (a) Communication with the consumer generally—Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt—

> (2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer[.]

52.     SLS was aware by at least September of 2013 that the Quinns were represented by counsel with respect to the subject loan. The correspondence and pleadings in the foreclosure action provided SLS with the name and address of the Quinns' counsel.

53.     Despite that knowledge, SLS continually sent correspondence to the Quinns demanding payment. The most recent of the correspondence being dated December 18, 2015.

54.     In addition to the written communications, SLS sent a "Independent Field Inspector" to the home of the Quinns in November and December of 2015 to attempt to collect on the debt.

55.     SLS violated the FDCPA by continuing to communicate directly with the Quinns when SLS knew the Quinns were represented by attorneys in connection with the debt.

**Count II**
**(Violation of §1692e(11))**

56.     Plaintiffs reallege paragraphs 1 to 49.

57.     The FDCPA contains a provision requiring certain notification to be included in any communication from a debt collector the consumer, in pertinent part:

> [T]he following conduct is a violation of this section:
>
> (11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.

15 U.S.C. §1692e(11)

58.     A "Field Inspector" visited the Quinn's home on at least three occasions leaving behind the "Confidential" door hangers containing notices. However, no notice was left (on or in the door hangers) that identify the Field

Inspector or SLS as a debt collector or that the person was attempting to collect a debt.

59.    SLS has violated the FDCPA by failing to comply with the "mini-miranda" requirements.

### Count III
### (Violation of §1692e(10))

60.    Plaintiffs reallege paragraphs 1 to 49.

61.    The FDCPA contains a provision banning false and misleading representations, in pertinent part:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

15 U.S.C. §1692e(10)

62.    The slips of paper left in the door hangers imply that an "inspector" visited the home leaving the impression that an inspection of the property was being conducted or was necessary.

63.    The door hangers demanded the consumer contact SLS ostensibly to discuss the results of the inspection or possibly to arrange for an inspection of the consumer's home in the future.

64.    However, dialing the telephone number found on the slip directs a consumer to SLS's general collections service. In fact, the phone tree begins with only two options (after selecting English language), Option No. 1 is for

brokers, mortgage companies, and attorneys. Option No. 2 in the phone tree is "to make a payment".

65.    SLS's telephone tree does not refer the consumer to an option relating to field inspections or mentioning the door hanger.

66.    Thus, any consumer that receives the door hanger is mislead into contacting SLS for purposes of collecting upon the debt and has nothing to do with inspecting the property.

67.    The use of the "Field Inspector" and the door slip is deceptive as it lulls the consumer into contacting SLS believing that purposes other than debt collection are at issue when in fact SLS wants the consumer to call to "make a payment".

68.    SLS has violated the FDCPA by using misleading and deceitful methods of communication with the Quinns to attempt to collect upon the debt.

**Count IV**
**(Violation of 15 U.S.C. §1692d)**

69.    Plaintiffs reallege paragraphs 1 to 49.

70.    The FDCPA prohibits the a debt collector from engaging in harassing or abusive conduct

> A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

15 U.S.C. §1692d

71.     SLS engaged in a campaign of harassing the Quinns by sending out "inspectors" to visit their home, including the "Independent Field Inspectors" in November of 2015, December of 2015, and January of 2016.

72.     The inspections were not being done in good faith to determine the condition of the property or whether the Quinns continued to reside in the property. Instead, SLS's purpose for the inspection was to embarrass and harass the Quinns.

73.     The Quinns felt uneasy about the inspectors presence outside their home. In particular, the visits by the "Independent Field Inspectors" emotionally affected the Quinns knowing people were knocking on their door to confront them about the debt without the representation of counsel and scaring their daughter who encountered one such person while she was home alone.

74.     As a result of SLS's actions, the Quinns have felt humiliated and fearful.

### Count V
### Violation of Illinois Consumer Fraud and Deceptive Practices Act

75.     Plaintiffs reallege paragraphs 1 to 49, 51 to 55, 57 to 59, 61 to 68, and 70 to 74.

76.     The Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") prohibits the use of unfair or deceptive practices in the conduct of any trade. ICFA reads in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of

any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

815 ILCS 505/2

77. SLS's conduct includes:

* Sending communications to the Quinns that failed to identify SLS as a debt collector;

* Sending persons to the Quinns home for the purpose of harassment;

* Sending communications to the Quinns when SLS knew they were represented by counsel; and,

* Using misleading communications to get the Quinns to contact them regarding the debt.

78. SLS's campaign of harassment and violations of the FDCPA, as set forth above, constituted both unfair and deceptive practices, in violation of §2 of ICFA.

79. SLS engaged in the conduct complained of in the course of trade and commerce.

80. The Quinns suffered pecuniary loss and emotional distress as a result of SLS's conduct, including the risk of now losing their home to foreclosure.

81. SLS acted willfully and knowingly.

WHEREFORE, Thomas and Theresa Quinn respectfully requests that judgment be entered against Specialized Loan Servicing, LLC for the following:

A. Declaratory judgment that SLS's conduct violated the FDCPA and ICFA;

B.      Actual damages, pursuant to 15 U.S.C. §1692k and 815 ILCS 505/10a;

C.      Statutory damages pursuant to 15 U.S.C. § 1692k;

D.      Costs and reasonable attorney fees pursuant to 15 U.S.C. §§ 1692k; and 815 ILCS 505/10a(c); and,

E.      For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Lloyd Brooks

_____

One of Plaintiffs' Attorneys

## DEMAND FOR JURY TRIAL

Please take notice that plaintiffs Thomas and Theresa Quinn demand trial by jury in this action.

/s/ Lloyd Brooks

_____

Attorney for Plaintiffs

Lloyd Brooks - State Bar No. 6271994
lbrooks@clg-lawfirm.com
Charles Howell - State Bar No. 6298445
chowell@clg-lawfirm.com
Deadra Woods Stokes - State Bar No. 6231406
dstokes@clg-lawfirm.com
**CONSUMER LEGAL GROUP, P.C.**
4747 Lincoln Mall Drive, Suite 410
Matteson, Illinois 60443
(708) 283-5900 Telephone No.
(708) 747-2390 Facsimile No.
***Attorneys for Plaintiffs***